UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CuffCuffCuff, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Walk Like a Duck Entertainment, LLC, <br> Pig Farmer, LLC, <br> Salvation Film, LLC, <br> Robin D. Goodrich, <br> Cameron Blyth Goodrich, and <br> Jason Armstrong <br><br> Defendants. | CIVIL ACTION NO. |

## COMPLAINT

### Introduction

This action arises from the Defendants' fraudulent and deceptive solicitation of a thirty (30) day "bridge loan" from Plaintiff, CuffCuffCuff, Inc. ("Cuff"). Defendant Cameron Blyth Goodrich ("Cameron") leveraged his friendship with Cuff's principal, Robert Cuff ("Robert") to obtain last minute bridge financing for a film titled *Squealer* (the "Film") on behalf of the other Defendants. Cuff brings this action after enduring two years of false assurances of repayment, guarantees and misrepresentations about the status of the Film and the financial status and solvency of the production companies.

### Jurisdiction

This court has subject matter jurisdiction over the claims set forth herein pursuant to 28 U.S.C. § 1332 as the Plaintiff and Defendants (inclusive of their members) are citizens of different states and the amount in controversy, exclusive of costs and statutory interest, is greater than

$75,000. As set forth below, Plaintiff is a citizen of California. Defendants Walk Like a Duck Entertainment, LLC, Pig Farmer, LLC and Salvation Film, LLC (collectively the "LLC Defendants") are citizens of the Commonwealth of Massachusetts. Defendants Robin Goodrich and Jason Armstrong are the managing members of the Defendant LLCs and residents of Massachusetts and New Jersey, respectively. Therefore, complete diversity exists between Cuff and the Defendants in this action.

### Venue

This action is properly brought before this Court as the Defendant LLCs are located in the Commonwealth of Massachusetts and the individual Defendants' actions or omissions occurred in the Commonwealth of Massachusetts. Additionally, the Parties agreed that any controversy arising from the contracts discussed herein shall be brought in Massachusetts.

### Parties

1. Cuff is a corporation organized under the laws of the state of California and has a principal place of business located at 3786 Stewart Avenue, Los Angeles, CA 90066. Among other things, Cuff engages in short film production for use in advertising and other purposes.

2. Defendant Walk Like a Duck Entertainment, LLC ("WLAD") is a limited liability company organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 300 Beal Street., Apartment 1420, Hingham, MA 02043.

3. Defendant Pig Farmer, LLC ("Pig Farmer") is a limited liability company organized under the laws of the state of New Mexico with a principal address of 300 Beal Street, Apartment 1420 Hingham, MA 02043. Jay and Defendant Robin D. Goodrich are the sole members of Pig Farmer. Upon information and belief, Pig Farmer is a single purpose entity organized for the purposes of producing the Film.

4. Defendant Robin D. Goodrich ("Goodrich") is, upon information and belief, a resident of the Commonwealth of Massachusetts with a principal address of 31 Cove Street, Duxbury, Massachusetts 02332.  Goodrich is the managing member of WLAD and Pig Farmer and upon information and belief, controls both entities.

5. Cameron is, upon information and belief, a resident of the Commonwealth of Massachusetts with a principal address of 17 Twomey Ct., Apartment 56, South Boston, Massachusetts 02127.

6. Jason Armstrong ("Jay") is an individual with a principal address of 18 Park View Avenue, Apartment 324, Jersey City, NJ 07302 and upon information and belief, a member of Pig Farmer, WLAD, and Salvation Film, LLC

7.  Defendant Salvation Film, LLC ("Salvation") is a limited liability company organized under the laws of the Commonwealth of Massachusetts.  Salvation had a principal place of business located at 300 Beal Street, Apartment 1420, Hingham, Massachusetts 02043.  Salvation was involuntarily dissolved on December 29, 2023.

**Factual Allegations**

8. Cameron and Robert initially met while attending Vanderbilt University.  They shared a mutual interest in the creative arts and film industry.

9. After graduating in 2007, Robert began work in the film and television production industry in/around New York.

10. In/around 2015, Robert relocated to the Los Angeles area to further develop his career in television and film production.  Robert currently works as a freelance creative director/writer through his corporation, Cuff.

11. Upon information and belief, Cameron remained in Massachusetts and developed a career in film production with his brother Goodrich and Jay.

12. According to its Facebook profile, "Walk Like a Duck Entertainment is a film production company co-founded by Jason Armstrong and Rob Goodrich that develops and produces high quality scripted and non-scripted content."

13. On/around February 3, 2022, Robert was contacted by Cameron through a mutual friend, Mark Mulcahy ("Mark") by text message.[1] A true and accurate copy of that text message exchange is attached hereto as **Exhibit A**.

14. As demonstrated by Exhibit A, Mark asked Robert if he was "interested in making a bridge loan with cam" and forwarded a message purportedly from Cameron, which stated "tell him-at least $100K, 10% return within the month, co-EP credit." *See id.*

15. Robert initially expressed skepticism and asked for information on Cameron's company and his usual investment returns. *See id.*

16. In response, Mark provided what he described as WLAD's bio, which appeared to be a lengthy profile of WLAD, including information regarding Cameron, Goodrich, and their joint film credit history. *See id.*

17. During this same text conversation, Mark reiterated the basic terms of the proposal as "$100K at least, 10% return within month, not an investment, just a bridge loan." *Id.*

18. Mark informed Robert that he "wished he had 100K liquidity right now but it's all tied up on those stonks" but "I mean could easily be a quick 10K though…" *Id.*

---

[1] Robert's messages are in blue.

4

*Cameron's Sales Pitch*

19. Cameron sent Robert a separate text message later in the day on February 3, 2022, and followed up on Mark's conversation. A true and accurate copy of the text message exchange is attached hereto as **Exhibit B**.

20. Prior to receiving Cameron's February 3, 2022, text message, Robert had not communicated with Cameron in many years.

21. Without much introduction, Cameron immediately reiterated Mark's pitch, "basically to summarize, our senior lender has been delayed to Monday and we're looking to bridge the gap with at least $100K loan. It'd be at 10%, co-EP credit, returned within the month" *id.*

22. Apparently realizing that he had lost touch with Robert, Cameron quickly clarified his identity, stating "It's Cam btw" with a laughing emoji. *See id.*

23. Upon information and belief, Cameron knew that Robert was engaged in the film production industry through Cuff and that he would be interested in funding the loan and obtaining "co-EP credit."

24. As reflected in Exhibit B, Cameron employed a heavy-handed pitch and sent Robert successive text messages, links to interviews with Cameron's purported business partners at WLAD, and PowerPoint presentation about the Film, then under production with the name, "Squealer." *See id.*

25. When Robert expressed hesitant interest, Cameron continued to emphasize urgency and also offered that he had an $1M equity option, if Robert was interested in discussing pursuit of that option. *See id.*

26. Robert informed Cameron that he was at work and would call Cameron later that evening.

27. At/around 7:22 PM on the evening of February 3, 2022, Cameron sent additional text messages to Robert and requested his email address so Cameron could provide a copy of the proposed loan agreement.  *See id.*; *see also* email correspondence attached hereto as **Exhibit C**.

28. Cameron continued to push Robert for a commitment and followed up again on the morning of February 4, 2022, offering to discuss the terms of the proposed loan agreement.  *See* Exhibit B.

29. Defendants Cameron, Pig Farmer and WLAD proposed all the terms of the Loan, including principal balance, interest rate, and default provisions and selected Massachusetts law to govern the Loan Agreement.

30. Cuff never engaged in any lending transaction and was not familiar with lending laws applicable in the Commonwealth of Massachusetts.

31. After exchanging text messages regarding the Loan throughout the day on February 4, 2022, Robert requested confirmation of the essential terms stating "…basically just want to confirm-1) I loan you $100,000 and at the end of 30 days you pay me $110,000, correct? 2) the Co-EP credit still applies, right."  Cameron replied, "correct on both."  *See id.*

32. After exchanging drafts of the Loan Agreement, Robert again expressed concern to Cameron, stating "Not gonna lie.  I'm pretty nervous.  But I trust Cam Goodrich."  *Id.*

33. In an effort to assuage Robert's concern, Cameron stated "Although WLAD guaranteed it, I will also man to man guarantee this."  *Id.*

34. Once the Loan Agreement was signed, Robert, on behalf of Cuff, funded the loan pursuant to Cameron's instructions and sent $100,000 (the "Loan") to an account at Bank of America purportedly in the name of Pig Farmer LLC.

35. A true and accurate copy of the Loan Agreement, executed by Cuff and Pig Farmer and guaranteed by WLAD is attached hereto as **Exhibit D**.

36. Pursuant to the terms of the Loan Agreement, the Loan was to mature and be repaid with interest on March 1, 2022.

37. Cuff was not repaid by the March 1, 2022, deadline.

*A Year of Misrepresentations and False Assurances*

38. On February 28, 2022, Cameron emailed Robert to provide a purported update on the status of the Loan repayment, which was due to Cuff the following day. A true and accurate copy of this email is attached hereto as **Exhibit E**.

39. In that email, Cameron disclosed for the first time that Defendants had not yet obtained their financing for the film and until that occurred, they could not repay Cuff but hoped to "complete[] the transaction very soon." *See id.*

40. On March 11, 2022, Cameron and Robert exchanged emails and text messages, wherein Robert expressed concern about Defendants' ability to repay the Loan and informed Cameron that he "would like to cash out ASAP." *See* email correspondence attached hereto as **Exhibit F**.

41. Between March 11, 2022, and June 8, 2022, Cameron sent Robert multiple text messages regarding the ongoing contractual negotiations between attorneys for WLAD, Pig Farmer and unnamed financers, distributors, and actors involved in the film's production. True and accurate copies of these text messages are attached hereto as **Exhibit G**.

42. Although these messages purported to provide "updates," each successive message cast uncertainty about the viability of the financing which Cameron had represented was secured <u>prior</u> to Cuff's execution of the Loan Agreement. Such messages set forth in Exhibit G include,

   a. March 11, 2022: "Goodrich and Jay are hustling to finalize our deal and close you out."

    b. March 16, 2022: "[E]verything is with the lawyers now and we're pushing them to complete this week…Once that happens, our number 1 priority is getting you out, with penalties and fees included."

    c. March 18, 2022: "…looks like the lawyers will finalize their negotiations next week."

    d. March 23, 2022: "…this have certainly progressed and looking positive to close the deal sooner than later, but nothing is fully executed yet."

    e. April 6, 2022: "our lawyer is pushing very hard to finalize this deal asap".

    f. April 19, 2022: "no big update yet, but still grinding away. Thankfully we have multiple deals on the table now (still think Lionsgate domestic will be settled first), but whichever does, <u>you will have the first payout</u>." (emphasis added)

    g. April 28, 2022: "We have collectively agreed that no matter which hits first of all our projects, first monies out will be to any outstanding loans, aka you!"

    h. May 18, 2022: "We will be closing very soon man, that I do now, so at least wanted to give you the latest update!"

    i. June 8, 2022: "[W]e are expecting it to finalized VERY soon…you are the first payout when this does, so the second we do, I will be calling with the good news man!"

43. After one month of silence, on July 18, 2022, Cameron sent Robert a lengthy message stating, in relevant part, that "Goodrich and Jay believe we should have everything fully finalized, money in the bank and loan paid back in full with all penalties included within the next 30-45 days, if not sooner." A true and accurate copy of this message is attached hereto as **Exhibit H**.

44. The loan was not repaid in 30-45 days and in fact, none of the Defendants communicated with Robert until he sent Cameron a text message on October 9, 2022 stating that "we've reached the point where we need the money back." *See* **Exhibit I**.

8

45. On October 9, 2022, Robert and Goodrich exchanged emails regarding the status of the Film's production and sale. *See* **Exhibit J**.

46. Among other things, Goodrich informed Robert that foreign sales of the Film were "underway" but no sales had been struck. Goodrich provided a "confidential" copy of his foreign sales estimate dated in May 2022, indicating that Pig Farmer and WLAD had only received a single offer of $20,000 for distribution rights.

47. On October 14, 2022, Goodrich and Jay revealed that at the time they committed to the March 1, 2022, Loan maturity date, the commitment was based on the presumption that repayment could be made through "union/guild bonds" that were secured for payment of "union or guild crew-member payroll" and not from any financing that was already secured. *See* Email attached hereto as **Exhibit K**.

48. In fact, the October 14, 2022, email clarified for the first time that Defendants could not and would not commit to a repayment date but Defendants expressly (and falsely) stated "The loan will unquestionably be repaid, inclusive of penalties, of course." *Id.*

49. Defendants continued their false assurances by offering Cuff an interest in another piece of intellectual property allegedly held by Salvation Film, LLC ("Net Profit Participation Agreement"). *See id.*

50. The Net Profit Participation Agreement was not intended to satisfy the debts due under the Loan Agreement. Rather, it was offered consideration for Cuff's extension of the Loan's maturity date.

51. Consistent with their bad faith dilatory conduct to date, Jay and Goodrich failed to deliver paperwork memorializing this Net Profit Participation Agreement from Salvation until April 2023

9

following Cuff's repeated requests for the same. *See* Net Profit Participation Agreement attached hereto as **Exhibit L**.

52. The Net Profit Participation Agreement was signed by Salvation and Cuff.

53. By issuing the Net Profit Participation Agreement through Salvation, Defendants Goodrich and Jay purported to offer Cuff "3% of 100% of the net profits from exploitation of [*Salvation*]. *See* Exhibit L, ¶1.

54. On December 16, 2022, Robert inquired whether he was still receiving Co-Ep Credit on the Film pursuant to the Loan Agreement. *See* Text Messages attached hereto as **Exhibit M**.

55. Despite these representations and contractual obligations, Cameron revealed that while Robert would be listed as an executive producer for the film on IMDB, "as for credit in the actual film, it was submitted by WLAD on a shared EP card, I have to say that ultimately, the final position of credits is up to the discretion of Lionsgate tho." *Id.*

56. On February 8, 2023, Goodrich and Jay (on behalf of WLAD and Pig Farmer) revealed that contrary to their prior representations, the Film was still undergoing technical "QC" and contractual negotiations with Lionsgate were still underway. *See* Email attached hereto as **Exhibit N**.

57. In other words, no domestic or international distributor could purchase rights to the Film because it was not yet complete.

58. Defendants' false assurances continued throughout the winter and spring of 2023, with repeated false assurances that the Film was on track to be sold.

59. On Saturday May 13, 2023, Robert emailed the Defendants and demanded they commit to: (1) a firm repayment date, (2) a priority lien on the Film's copyright and a personal guarantee until

repayment, (3) full transparency on all financing of the film and (4) an overview of the repayment waterfall. *See* Email attached as **Exhibit O**.

60. Jay and Goodrich responded to Robert by email on May 13, 2023. Their response attached a letter on WLAD letterhead, which revealed starkly different financial information and disclosures than what was disclosed to date. A true and accurate copy of this letter (the "May 2023 Letter") and the accompanying email is attached hereto as **Exhibit P**.

61. Among other disclosures, the May 2023 Letter revealed that Cuff could never have been first in line for repayment. In fact, Cuff sits behind three separate lenders holding a cumulative $700,000 of debt with accruing default interest.

62. In the May 2023 Letter, Defendants acknowledged that as of May 12, 2023, Defendants Pig Farmer and WLAD owed Cuff $172,000, inclusive of principal balance and interest.

63. The May 2023 Letter also purported to modify the Loan Agreement and set forth a proposal to ensure repayment of the balances then due and owing, which included:

  a. A Personal Guaranty executed by Cameron and Goodrich;

  b. A so called "Letter of Redirection;"

  c. A revised repayment date of November 1, 2023; and

  d. A revised penalty of $5,000 per month starting November 2, 2023, if the full balance was not repaid.

64. Cuff accepted the terms of the May 2023 Letter and agreed to a final extension of the maturity date until December 15, 2023.

65. The terms of the May 2023 Letter and Cuff's acceptance of the same constituted an amendment of the Loan Agreement.

66. Defendants failed to uphold their obligations set forth in the May 2023 Letter.

11

*The Personal Guaranty*

67. Robert continued to engage in limited discussions with the Defendants during the summer and fall of 2023 and expected to receive the Personal Guarantee and Letter of Redirection consistent with the May 2023 Letter.

68. As he failed to receive the same and Defendants failed to meet the November 1, 2023, Loan repayment deadline, Robert repeatedly expressed his intention to institute legal measures to recover Cuff's continually accruing damages.

69. On November 3, 2023, Goodrich and Cameron provided the Personal Guarantee and requested the repayment date be further extended to December 3, 2023. A true and accurate copy of the Personal Guarantee attached hereto as **Exhibit Q**.

70. As reflected in the Personal Guarantee, Cameron and Goodrich committed to satisfying the debt due under the Loan Agreement through net revenue from films including "Skelly", "Salvation" and/or cash flow received from WLAD. *See id.*

71. Robert accepted their representations, relied on the Personal Guarantee and awaited repayment.

*Surreptitious Sale of the Film*

72. Upon information and belief, the Film was purchased by Lions Gate Entertainment Corporation and released in theaters and streaming platforms on November 3, 2023.

73. The Defendants did not inform Cuff of the sale.

74. On November 15, 2023, Robert emailed the Defendants requesting an update on the anticipated repayment. *See* Email attached hereto as **Exhibit R**.

75. Instead of disclosing the sale of the Film, on November 16, 2023, Goodrich replied and confirmed that "We look forward to honoring the Dec. 15, 2023, date." *See id.*

76. In anticipation of receiving the Loan repayment, Robert provided wire instructions to the Defendants on December 11, 2023. *See* Email attached hereto as **Exhibit S**.

77. December 15, 2023, passed without repayment.

78. Upon information and belief, Defendants have distributed revenue received from sale of the Film and through their misrepresentations and fraudulent conduct described above, prevented Cuff from exercising its rights under the Loan Agreement.

*Intermingling of Corporate Actions and Interests*

79. Defendants Goodrich, Jay, and Cameron have repeatedly utilized WLAD, Pig Farmer, and Salvation in furtherance of their collective efforts to defraud Cuff.

80. Although the May 2023 Letter and the Net Profit Participation Agreement were issued by Pig Farmer and Salvation, respectively, each document was executed on WLAD letterhead and sent from a WLAD email domain.

81. Goodrich and Jay have collective and pervasive control over WLAD, Pig Farmer, Salvation and other entities related to film production.

82. Although the Loan Agreement was executed between Pig Farmer and Cuff, it was guaranteed by WLAD and subsequently guaranteed by Cameron and Goodrich.

83. In furtherance of their efforts to defraud Cuff and forestall collection under the Loan Agreement, Goodrich and Jay used their purported interest in Salvation quell Cuff's justifiable concerns about Defendants' deceptive conduct and failure to repay the Loan.

84. Upon information and belief, Pig Farmer is insolvent, Salvation is dissolved, and neither were properly capitalized.

## Count I
## Breach of Contract-The Loan Agreement
### (Pig Farmer and WLAD)

85. Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 84 as if fully set forth herein.

86. The Loan Agreement constitutes a valid, enforceable contract, governed by Massachusetts law.

87. Cuff fully performed under the Loan Agreement by wiring the principal balance of $100,000 to Pig Farmer's bank account pursuant to the instructions provided by Cameron.

88. The Defendants breached the Loan Agreement by, among other things: failing to repay the principal balance by the Maturity Date and failing to pay the accruing interest penalty.

89. Cuff has been and continues to be harmed by the Defendants' breach.

## Count II
## Breach of the Personal Guarantee
### (Goodrich and Cameron)

90. Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 89 as if fully set forth herein.

91. The Personal Guarantee constitutes a valid and separately enforceable contract.

92. Cuff fully performed under the Personal Guarantee by foregoing taking any legal action against the Defendants until the deadline under the Personal Guarantee passed.

93. Goodrich and Cameron each breached their Personal Guarantee by failing to repay the accrued balance due under the Loan when Pig Farmer and WLAD would not repay.

94. Cuff has been and continues to be harmed by Goodrich and Cameron's breach.

## Count III
## Fraud
## Execution of the Loan Agreement
## (Cameron, Goodrich, Jay, WLAD, and Pig Farmer)

95. Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 94 as if fully set forth herein.

96. In an attempt to obtain the Loan from Cuff, Defendants made multiple misrepresentations as stated above including but not limited to: (1) that Defendants had secured financing for the Film, the distribution of which was simply and temporarily delayed;(2) that the Loan would be repaid no later than March 1, 2022 once WLAD and Pig Farmer's financing was received; and (3) that Cuff would be the first creditor repaid.

97. Defendants knew these statements were false at the time they were made and knew that Cuff would rely on the falsity of the statements when executing the Loan Agreement.

98. Cuff has been and continues to be harmed by Defendants' fraudulent conduct.

## Count IV
## Fraudulent Inducement
## (Cameron, Goodrich, Jay, and WLAD)

99. Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 98 as if fully set forth herein.

100. After the March 1, 2022, maturity date passed, Cameron, Goodrich, Jay and WLAD made numerous false statements and representations intended to induce Cuff to refrain from immediate exercise of its rights under the Loan Agreement.

101. Such false statements include those set forth in paragraphs 40, 43, 47, 58, and the representations in the May 2023 Letter.

102. Cameron, Goodrich, Jay and WLAD knew the statements were false at the time the statements were made.

15

103.    As a direct result of such false statements, Cuff has been and continues to be harmed by Defendants' failure to deliver the letter of redirection and failure to repay the balance due under the Loan Agreement.

### Count V
### Fraud
### (Salvation, Jay, and Goodrich)

104.    Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 103 as if fully set forth herein.

105.    On August 18, 2021, Salvation was organized under the laws of the Commonwealth of Massachusetts.

106.    Upon information and belief, Goodrich and Jay are Salvation's members and managers.

107.    Salvation was organized as a film production company for the purposes of producing a film also titled *Salvation*.

108.    On or prior to December 21, 2021, Salvation secured financing from Coastal Capital Film Finance, LLC ("Coastal Capital").

109.    On December 21, 2021, Coastal Capital filed a UCC-1 Financing Statement with the Secretary of the Commonwealth. A true and accurate copy of this UCC-1 Financing Statement is attached hereto as **Exhibit T**.

110.    As reflected within Exhibit T, Salvation pledged "all proceeds and products of the items referred to in items (i) through (vii) above," which includes *Salvation*. *See* Exhibit T.

111.    When the Net Profit Participation Agreement was offered and executed on April 21, 2023, Salvation warranted and represented that, "*No rights are held or otherwise encumbered by any other party in or to the Project except as expressly set forth herein, and (c) that [Salvation]*

*has not entered into and will not enter into any agreement that will materially interfere or conflict with the rights granted or obligations assumed under this Agreement to the other Parties.*" See Exhibit L, ¶2.

112.     This warranty was false when it was made because, among other things, Salvation had already granted Coastal Capital interest in all proceeds from *Salvation* as reflected in Exhibit T.

113.     Goodrich and Jay used Salvation to fraudulently issue the Net Profit Participation Agreement as a means to forestall Cuff's collection of under the Loan Agreement until after the sale of the Film to Lionsgate and distribution of the funds received therefrom.

114.     Cuff has been and continues to be harmed by Goodrich, Jay and Salvation's fraud.

### Count VI
### Violation of G.L. c. 93A, § 11
### (WLAD and Pig Farmer)

115.     Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 114 as if fully set forth herein.

116.     WLAD and Pig Farmer are engaged in the trade and commerce of film production through their members who are located in Massachusetts and New Jersey.

117.     Pig Farmer is a citizen of the State of New Mexico but conducted business in Massachusetts through its members including Goodrich and Jay.

118.     WLAD and Pig Farmer employed unfair and deceptive practices to solicit investment from Cuff and to obtain forbearance on their collective repayment obligations under the Loan Agreement.

119.     The Loan Agreement is governed by Massachusetts law.

120. WLAD and Pig Farmer's conduct was knowing and willful and intended to obtain the benefit of Cuff's Loan without repaying the same.

121. Cuff has suffered and continues to suffer damages as a result of the Pig Farmer and WLAD's unfair and deceptive acts and practices.

### Count VII
### Specific Performance
### (Delivery of the Letter of Redirection)

122. Cuff repeats and incorporates herein by reference the allegations in paragraphs 1 through 121 as if fully set forth herein.

123. Pursuant to the terms of the May 2023 Letter, which modified the Loan Agreement, Pig Farmer offered to execute and deliver to Cuff a "Letter of Redirection" of the net proceeds from the sale of the Film.

124. Cuff accepted this offer and relied upon the same in agreeing to amend the Loan Agreement and extend the maturity date.

125. Cuff fully performed under the Loan Agreement, as amended by the May 2023 Letter, and abstained from seeking collection under the Loan Agreement until December 2023.

126. Despite Pig Farmers' obligations, it has failed to deliver the Letter of Redirection.

127. Equity and justice require that Pig Farmer execute and deliver the Letter of Redirection as required under the Loan Agreement.

### Count VII
### Unjust Enrichment
### (Pig Farmer, WLAD, Jay, Goodrich and Cameron)

128. Cuff repeats and incorporates herein by reference its allegations in paragraphs 1 through 127 as if fully set forth herein.

129. By providing the Loan and forbearing collection for two years, Cuff has conferred a benefit on Pig Farmer, Cameron, WLAD, Jay and Goodrich.

130. Pig Farmer, Cameron, WLAD, Jay and Goodrich knowingly accepted the Loan and the benefits of Cuff's forbearance, which include profits from the sale of the Film.

131. Cuff reasonably expected compensation from Pig Farmer, Cameron, WLAD, Jay and Goodrich for the Loan and its forbearance on collecting the same.

132. It would be inequitable to permit Pig Farmer, Cameron, WLAD, Jay and Goodrich to retain the benefits of the Loan, interest due thereon without repayment of the same to Cuff.

133. Cuff remains damaged by such unjust enrichment.

## Jury Demand
**Cuff demands a trial by jury on all claims so triable.**
### Prayer For Relief

WHEREFORE Cuff requests this Court:

1) Enter judgment in favor of Cuff on all Counts of the Complaint;

2) Award sums lawfully due under the Loan Agreement and Personal Guarantee;

3) Award reasonable attorney's fees as provided under the Loan Agreement;

4) Order Defendants disgorge any ill-gotten gains and revenue derived from the Loan and failure to repay the same;

5) Award Cuff treble damages for WLAD and Pig Farmer's knowing violation of G.L. c. 93A, § 11;

6) Compel Defendants' production of the Letter of Redirection

7) Grant Cuff such further relief deemed just and fair.

[signature block- next page]

Respectfully submitted,

CuffCuffCuff, Inc.,

By its attorneys,

*/s/ Colin T. Barrett*
Colin T. Barrett  (BBO #690726)
Francis R. Powell (BBO# 641325)
colin.barrett@nelsonmullins.com
francis.powell@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA  02111
(617) 217-4700
(617) 217-4710 (fax)

20